<hr/>

### STATE *vs.* ISAAC D. SMITH.

Third Judicial District, Bridgeport, April Term, 1896. ANDREWS, C. J., TORRANCE, FENN, BALDWIN and HAMERSLEY, Js.

The right to license the pursuit of a lawful business which, as usually carried on, does not endanger the public health or safety, and thus to limit the number of those who may engage in it, is one of the highest powers of sovereignty. When conferred upon a municipal corporation, the grant cannot be extended by any doubtful implication.

By charter the common council of the city of Bridgeport was authorized to make ordinances not repugnant to the laws of this State, relative (among other things) "to licensing cartmen, truckmen, hackmen, butchers, bakers, petty grocers or hucksters, and common victualers"; and by the concluding clause of the same section, to make ordinances relative "to any and all other subjects that shall be deemed necessary and proper for the protection and preservation of the health, property, and lives of the citizens." The common council passed an ordinance to prohibit within the city the sale of adulterated or impure milk, one clause of which required every one who sold any milk of any kind to first procure a license therefor, under a penalty of $50. In a criminal prosecution for a sale of milk without a license it was *held :*—

1. That in view of general statutory provisions, which in many respects covered the same matters referred to in the ordinance, but in a different way, and left the business of a milkman open to all on equal terms

throughout the State, so much of the ordinance as required a license from all who sold milk, without regard to whether they were petty grocers, hucksters, or common victualers, or not, went beyond the power specifically conferred by the charter, and was therefore void.
2. That the "general welfare" clause must be read with strict reference to what preceded it, and when so construed, did not justify the license requirement.

[Argued April 22d—decided May 14th, 1896.]

PROSECUTION for violation of an ordinance of the city of Bridgeport relating to the sale of milk without a license, brought to the City Court of Bridgeport and thence by the defendant's appeal to the Criminal Court of Common Pleas for Fairfield County and tried to the court, *Walsh, J.,* upon the defendant's demurrer to the information; the court overruled the demurrer and, upon the refusal of the accused to answer over, having found him guilty, imposed a fine of $50, from which judgment the defendant appealed to this court for alleged errors of the trial court in overruling his demurrer. *Error.*

The ordinance was as follows: "An Ordinance to Prohibit the Sale of Adulterated or Impure Milk in the City of Bridgeport.

"Be it ordained by the Common Council of the City of Bridgeport: Section 1. Any person who by himself, his servant or his agent, shall sell, exchange, or deliver or have in his possession, with intent to sell, exchange or deliver, or expose or offer for sale as pure milk, any milk from which the cream or any part thereof has been removed, or which has been watered, adulterated or changed in any respect by the addition of water or other substance, shall be liable to the penalties hereinafter provided in this ordinance.

"Section 2. Any person who by himself, his servant, or his agent, shall sell, exchange or deliver, any milk from which the cream or any part thereof has been removed, unless, in a conspicuous place above the center upon the outside of every vessel, can or package containing such milk, the words 'Skimmed Milk' are distinctly marked in Gothic letters, not less than one inch in length, shall be liable to the penalties hereinafter provided in this ordinance.

"Section 3. Any person who by himself, his servant, or his agent, shall sell, exchange or deliver, any skimmed milk containing less than eight and fifty one hundredths (8.50) per cent. of the milk solids, exclusive of butter fat, shall be liable to the penalties hereinafter provided in this ordinance.

"Section 4. Any person who by himself, his servant or his agent, shall sell or offer for sale, or who shall have in his possession, with intent to sell or offer for sale, any impure or adulterated or unwholesome milk, and every person who shall adulterate milk, or who shall keep cows for the production of milk, in a crowded or unhealthy condition, or feed the same on food that produces impure, diseased or unwholesome milk, or shall feed cows on distillery waste, usually called "swill," or upon any substance in the state of putrefaction or rottenness, or upon any substance of an unwholesome nature, shall be liable to the penalties provided in this ordinance.

"Section 5. The addition of water or any other substance or thing is hereby declared an adulteration, and milk that is obtained from animals that are fed on distillery waste, or upon any substance in a state of putrefaction or rottenness, or upon any substance of an unwholesome nature, or milk that has been exposed to or contaminated by the emanations, discharges or exhalations from persons sick with any contagious disease by which the health or life of any person may be endangered, or milk from tubercular cows, is hereby declared to be impure, unwholesome and adulterated.

"Section 6. In all prosecutions under this ordinance, any milk which shall be found, upon analysis by the chemist employed by the Board of Health, to contain more than 88 per cent. of water fluids, or to contain less than 12 per cent. of milk solids, or to contain less than eight and fifty one hundredths per cent. of milk solids, exclusive of butter fat, except during the months of May and June, when it must not contain less than 12 per cent. of milk solids, shall be deemed to be adulterated.

"Section 7. It shall be lawful for the Board of Health or any member thereof, or the health officer, the board's agents,

assistants or inspectors, to enter any premises or vehicle of any person who shall carry, keep, expose, or offer milk for sale, to inspect said milk and the premises from which said milk is derived, and if, upon inspection, he shall find any milk which has been adulterated, or from which the cream or any part thereof has been removed, or which is sold, offered or exposed for sale, or held in possession with intent to sell or offer for sale, in violation of any section of this ordinance, said health officer, agent, assistant or inspector, is empowered and directed to take samples of the same for analysis, and also to condemn the same as adulterated and impure.

"Section 8. No person shall expose or offer for sale any milk of any kind, unless he shall first obtain from the health officer a license therefor, for which the sum of two ($2) dollars shall be charged for the period of one year for each and every license. The license shall specify the time for which the same is issued, and the name of the licensee, the number of each license, which license number shall be placed on the outer side of all wagons or vehicles used in the conveyance and sale of milk, the figures to be not less than two (2) inches in height.

"Section 9. Any person who shall violate any of the foregoing sections of this ordinance shall forfeit and pay a penalty of fifty ($50) dollars for the first offense, and one hundred ($100) dollars for each subsequent offense. Upon conviction of a second offense, the license of such offender shall thereupon be revoked, in addition to the penalties hereinafter provided.

"Section 10. It shall be the duty of the health officer to keep a complete record of his proceedings and of all inspections, giving a full account of all inspections, including the names of each person, producer, firm or corporation owning the milk inspected, together with the farm or farmer from which milk is received, place of business, number of cows, and their breed, and the result of such analysis to be printed in the city papers willing to publish the same, with names of producers and dealers from whom milk has been received, showing to what extent the samples may appear to be adul-

terated or otherwise altered or deficient within the meaning of this ordinance.

"Section 11. All ordinances or parts of ordinances inconsistent herewith are hereby repealed."

*Stiles Judson, Jr.*, for the appellant (defendant).

It will hardly be claimed that the ordinance in question is expressly authorized by the city charter. If sustainable at all it must be by virtue of the general provisions of that instrument relating to the health of the community, or derived from the charter as an implied police power necessary to give effect to some express provision therein. The authority however to enact a penal by-law, is one not to be inferred from language in any respect ambiguous or doubtful. Dillon's Munic. Corp., §§ 89–91; Beach Pub. Corp., 77; *Leonard* v. *Canton*, 35 Miss., 189; *Minturn* v. *Larne*, 23 How., 437; *Burritt* v. *City*, 42 Conn., 202; *Pratt* v. *Litchfield*, 62 id., 118; *Wallingford* v. *Hall*, 64 id., 431; *Thompson* v. *Lee Co.*, 3 Wall., 320; Sedg., Stat. and Const. Law, 423; *City* v. *Whitney*, 36 Conn., 373. The legislature having in its wisdom decided what occupations should thus be burdened, the city of Bridgeport cannot enlarge the scope of its licensing power, by resorting to the general welfare clauses of its charter. *Robinson* v. *Mayor*, 34 Am. Dec., 629; *City of St. Louis* v. *Laughlin*, 49 Mo., 559; *City of St. Joseph* v. *Porter*, 29 Mo. App., 609; *State* v. *Ferguson*, 33 N. H., 425; *Huesing* v. *City of Rock Island*, 128 Ill., 469; *Thomas* v. *Ry. Co.*, 101 U. S., 82; *City* v. *Hughes*, 15 Mich., 59; *Leonard* v. *City*, 35 Miss., 189; *City* v. *Scroggs*, 39 Iowa, 447; *Buttler's Appeal*, 73 Pa. St., 452; *Ordinary* v. *Retailers*, 42 Ga., 326; *Tuck* v. *Waldron*, 31 Ark., 465; *Harris* v. *Council*, 28 Ala., 577; *City of Cairo* v. *Bross*, 101 Ill., 477. And it is not sufficient that it is simply convenient to exercise the expressly granted power, it must be indispensable. *New London* v. *Brainard*, 22 Conn., 551; 2 Dillon Munic. Corp., 173. This ordinance, in all of its essential provisions, is in contravention of the laws of the State, and therefore invalid. By the provisions of Chap. 235 of the

Public Acts of 1895, which Act went into effect subsequent to the charter of the city of Bridgeport, it was determined that the standard of purity of all food products (the term "food" including "milk") should be fixed by the Connecticut Agricultural Experimental Station, when not fixed by statute. The ordinance in question attempts to fix another and quite different standard; one that the legislature of 1895 repudiated as impracticable and unjust. (See Pub. Acts 1895, Chap. 245, repealed by Pub. Acts 1895, Chap. 320.) In fact, the doctrine that a statute and an ordinance covering precisely the same subject, may be in operation concurrently, has been repudiated in this State. *Southport* v. *Ogden*, 23 Conn., 131; *State* v. *Welch*, 36 id., 217; *State* v. *Brady*, 41 id., 590. The ordinance is also vicious because under the guise of a sanitary measure, it seeks to wrest a revenue from those who bring this farm product into the city for sale. *Grumm* v. *Mayor*, 84 Ga., 365; *Commonwealth* v. *Stodder*, 2 Cush., 573. If the ordinance operates in restraint of legitimate trade, it is void. *Chaddock* v. *Day*, 4 L. R. A. 809. If the penalty is oppressive and unreasonable, the ordinance is rendered thereby invalid. 1 Dillon Munic. Corp., §§ 319, 320, 327, 321; Cooley, Const. Lim., 243.

*John H. Light* and *V. R. C. Giddings*, for the appellee (the State).

The license fee is required as a measure to pay for the expenses of inspection. *Amesbury* v. *Bowditch Mutual Fire Ins. Co.*, 6 Gray, 596; *State* v. *Wheeler*, 25 Conn., 290; 1 Dillon Mun. Cor. (4th Ed.), § 421. The courts will not interfere with the legitimate exercise by municipal bodies of their police powers by which the peace, health, comfort, and general welfare are secured or promoted. *Weil* v. *Ricard*, 24 N. J. Eq., 169; *Boehm* v. *Baltimore*, 61 Md., 259; *Littlefield* v. *State*, 42 Neb., 223. Where a business is beneficial or necessary, but yet liable to cause danger, under certain conditions, to the public health, it can be regulated and those engaged in it can be required to take out licenses and to submit to an inspection of their business. This is far differ-

ent from an attempt to prohibit such beneficial or necessary business. *Train* v. *Boston Disinfecting Co.*, 144 Mass., 528. A distinction is to be carefully observed between an ordinance like the one in question and ordinances which, under the guise of a license, in effect impose a tax. Such latter are void as attempted assumptions of legislative powers of taxation. *North Hudson Railway Co.* v. *Hoboken*, 41 N. J. Law, 71; *Mayer* v. *Avenue R. R. Co.*, 32 N. Y., 261; 2 Dillon on Munic. Corp. (4th Ed.), § 768; *State* v. *Osborne*, (Fla.) 25 L. R. A. 120. Statutes and ordinances to secure the purity of milk have been uniformly upheld as beneficial and necessary. *People ex rel.* v. *Mulholland*, 82 N. Y., 326; *Johnson* v. *Simonton*, 43 Cal., 242; *Littlefield* v. *State*, 42 Neb., 223; *State* v. *Lowrey*, (N. J.) 6 Central Rep., 870; *People* v. *West*, 106 N. Y., 293; *Com.* v. *Evans*, 132 Mass., 11; *State* v. *Campbell*, 64 N. H., 402; *Shivers* v. *Newton*, 45 N. J. Law, 469; *State* v. *Smyth*, 14 R. I., 100; *State* v. *Schlemmer*, 10 L. R. A., 135, and notes; *State* v. *Moore*, (N. C.) 22 L. R. A., 474, and notes. The general provision of the charter conferring power to pass by-laws, "relative to any and all other subjects that shall be deemed necessary and proper for the protection of the health, property and lives of the citizens," contains the authority to pass by-laws relative to the sale of milk and require licenses therefor. 1 Dill. Mun. Corp., 4th Ed., § 315, note 1, p. 393: *State* v. *Ferguson*, 33 N. H., 424; *Husen* v. *City of Rock Island*, 128 Ill., 465; *Clark* v. *South Bend*, 85 Ind., 277. Chapter 235 of the Public Acts of 1895 fixes no standard at all, and that claim of the defendant is wholly without foundation. The ordinance and the statute do not cover the same ground. The ordinance (§§ 3 and 6), fixes a standard of purity for milk to be sold in Bridgeport; the statute does not. *State* v. *Flint*, 63 Conn., 248.

BALDWIN, J. The charter of the city of Bridgeport, which went into effect July 1st, 1895, authorized the common council to make ordinances, not inconsistent with law, relative to commerce; to the inspection of produce brought

into the city for sale, and the election of inspectors for that purpose; to the sale or offering for sale of unwholesome produce of all kinds; to "licensing cartmen, truckmen, hackmen, butchers, bakers, petty grocers, or hucksters, and common victualers, under such restrictions and limitations as said common council may deem necessary and proper;" to the health of the city; and to "any and all other subjects that shall be deemed necessary and proper for the protection and preservation of the health, property, and lives of the citizens." Special Acts of 1895, p. 532, § 41.

In the General Statutes, §§ 2658 to 2664 are grouped under the heading of "Adulteration of Milk." A Public Act went into effect August 1st, 1895, to regulate the manufacture and sale of food products, which classes as food, under that description, "every article used for food and drink by man, horses, or cattle." Public Acts of 1895, p. 578, Chap. 235, § 2.

General Statutes, § 2661, prohibits the sale or offer for sale of impure or adulterated milk. Section 2660 forbids the sale of any milk from which any cream has been removed, except out of a can, vessel, or package, to which is affixed, not more than six inches from the top, a metallic tag stamped "Skimmed Milk," in letters not less than an inch in height. For any violation of these provisions the offender may be fined not more than seven dollars or imprisoned not more than thirty days, or both.

The Act of 1895 (§ 3) declares that any article of food shall be deemed adulterated if, among other things, any substance be mixed with it so as to lower or injuriously affect its quality or strength, or if any valuable constituent has been wholly or in part abstracted, or if it is in any part the product of a diseased animal; and that the Connecticut Agricultural Experiment Station shall make analyses of food products on sale which it is suspected may be adulterated, and "may adopt or fix standards of purity, quality, or strength, when such standards are not specified or fixed by statute," and when it finds by analysis that adulterated food products have been on sale within the State, shall notify

the grand juror or prosecuting attorney of the town in which they were found. The sale or offer for sale of adulterated food, by one who knows it to be adulterated, and does not disclose this to the purchaser, is made punishable by a fine of not more than $500, or imprisonment for not more than one year.

At the same session of the General Assembly, two days later, another statute was enacted, but repealed the following week (Public Acts of 1895, pp. 588, 664), which declared the term "adulterated milk," as used in the statute laws of the State, to have the following meaning: "1. milk containing more than eighty-eight per centum of water or fluids; 2. milk containing less than twelve per centum of milk solids; 3. milk containing less than three per centum of fats; 4. milk drawn from cows within fifteen days before or five days after parturition; 5. milk drawn from animals fed on distillery waste or on any substance in a state of fermentation or putrefaction or on any unhealthy food; 6. milk drawn from cows kept in a crowded or unhealthy condition; 7. milk from which any part of the cream has been removed; 8. milk which has been diluted with water or any other fluid, or to which has been added or into which has been introduced any foreign substance whatever; 9. all adulterated milk shall be deemed unclean, unhealthy, impure, and unwholesome."

It is impossible to compare the ordinance of the city of Bridgeport with these statutory provisions, without seeing that in many respects they cover the same ground, and cover it in a different way.

The ordinance (§ 6) defines precisely adulterated milk, and gives conclusive effect to an analysis made by the chemist employed by the local board of health. The General Assembly, in 1895, first adopting and then repealing a somewhat similar definition, finally left the matter largely in the hands of the Connecticut Agricultural Experiment Station.

The sale of skimmed milk, by the city ordinance, is to be from cans bearing the words "Skimmed Milk" conspicuously stamped upon the side; by § 2660 of the General Stat-

utes it is to be from cans bearing a metallic tag on which the same words are stamped.

The pecuniary penalties imposed by the ordinance cannot be less than $50, nor more than $100. Under the general laws, they may be considerably less, and for some offenses more, besides an additional liability to imprisonment.

The public statutes leave the business of a milkman open to all, on equal terms, throughout the State; only imposing certain regulations upon those who may undertake it, and enforcing them, when necessary, by proceedings of a criminal nature, resulting in a sentence proportioned to the gravity of the offense. The ordinance excludes every one who has not received a license from the local health officer, from participating in it, within the city of Bridgeport, under pain of a fixed pecuniary forfeiture, which, in case of a second offense is to be doubled and to entail a loss of the license previously granted. Of these differences between the provisions of the by-laws in question and the general statutes, that last mentioned, unless found to be warranted by the terms of the city charter, is decisive of the present case.

Under the Constitution of this State, even the General Assembly has not unrestricted power to provide for the grant or refusal of licenses, without which a citizen cannot engage in what is one of the common occupations of life. *State* v. *Conlon*, 65 Conn., 478. It has confided to the Common Council of Bridgeport the right to make ordinances, relative to licensing cartmen, truckmen, hackmen, butchers, bakers, petty grocers or hucksters, and common victualers. Petty grocers or hucksters and common victualers may, as part of their business, sell milk; but the ordinance in question relates to licenses for all who sell milk, without regard to whether they are petty grocers, hucksters or common victualers, or not. It therefore goes beyond the power specifically conferred, and the "general welfare" clause, with which § 41 of the charter concludes, must be read with strict reference to what precedes it. The right to license the pursuit of a lawful business, which, as usually carried on, does

not endanger the public health or safety, and thus to limit the number of those who may engage in it, is one of the highest powers of sovereignty. When conferred upon a municipal corporation, the grant cannot be extended by any doubtful implication.

After giving full force to all the provisions of § 41, we are brought to the conclusion that it is, at least, doubtful whether the charter authorized the licensing of milkmen. It therefore did not authorize it; and that part of the ordinance was void upon which the complaint in the case before us was based. *Crofut* v. *Danbury*, 65 Conn., 294.

There is error in the judgment appealed from.

In his opinion the other judges concurred.